# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
### Tampa Division

| | |
|---|---|
| CLOVERLEAF HOLDINGS, LLC, B&T USA, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>PETER PENZELL,<br><br>*Defendant*. | Civil Action No. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Cloverleaf Holdings, LLC ("Cloverleaf") and B&T USA, LLC ("B&T USA") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this action against Defendant Peter Penzell ("Penzell" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1. This action arises from a sustained campaign by Defendant Peter Penzell, a minority, non-voting, solely economic member of Cloverleaf Holdings, LLC, to misuse Cloverleaf's and B&T USA's (which is managed by Cloverleaf) confidential information, proprietary data, and trademarks, undermine lawful management, disrupt core operations, and, in concert with adverse foreign interests,

- 1 -

position himself to seize control of B&T USA for personal gain. Cloverleaf's entire business is to act as Manager for B&T USA.

2.    Penzell holds no voting rights, management authority, or operational role in Cloverleaf or B&T USA. Despite these limits, he inserted himself into sensitive areas of the B&T USA business, including finances, legal representation, regulatory and compliance matters involving governmental authorities, employee reporting, banking, vendor and supplier relationships, customer relationships, and information technology. He solicited and obtained highly confidential and proprietary financial data, internal accounting records, client data and records, and compliance materials subject to strict contractual, statutory, and regulatory confidentiality obligations, then used that information to hurt Plaintiffs.

3.    Penzell was not authorized to seek or obtain this information, and he has no lawful purpose to see B&T USA's information in the first place. Indeed, contemporaneous communications reveal that Penzell analyzed the information to develop strategies to take over and undermine B&T USA's business, including conspiring with executives of B&T AG—a Swiss vendor and contractual counterparty of B&T USA that lacks the ability to sell, manufacturer, or operate directly in the United States. The purpose of these communications was to effectuate a change of control by displacing B&T USA's lawful Manager (Cloverleaf) and elevate B&T AG's role in U.S. operations.

4.      In addition to damages and declaratory relief for harm caused to B&T USA, Cloverleaf seeks damages and judicial expulsion of Defendant. Penzell's misconduct has materially and adversely affected Cloverleaf's activities and affairs, destroyed trust essential to its management and operation of B&T USA, and made it not reasonably practicable for Cloverleaf to continue operating with Penzell remaining as a member, even in a non-voting capacity.

## THE PARTIES

5.      Plaintiff Cloverleaf Holdings, LLC is a Florida limited liability company that owns 51% of B&T USA and is its designated Manager.

6.      Plaintiff B&T USA, LLC is a Florida limited liability company and a firearms assembler and wholesaler that owns the United States trademark rights to "B&T." Cloverleaf is the sole manager of B&T USA.

7.      Defendant Peter Penzell is an individual residing in Maryland who owns a 33% non-voting, economic interest in Cloverleaf. Penzell has no voting, managerial, or governance rights in Cloverleaf, and he has no rights, economic or otherwise, or B&T USA.

## JURSIDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836, and the Lanham Act, 15 U.S.C. §§ 1114 and 1125.

9. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this District under 28 U.S.C. § 1391 because both Cloverleaf and B&T USA are Florida limited liability companies, the Cloverleaf Operating Agreement is governed by Florida law, and a substantial portion of the wrongful conduct giving rise to this action, including the misuse of highly confidential and proprietary information, interference with corporate governance, and harm to Florida-based business operations, occurred in this District.

11. This Court has personal jurisdiction over Peter Penzell pursuant to Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(1) and (2), because Defendant engaged in and carried on a business venture in Florida through his non-voting membership in Cloverleaf, a Florida limited liability company governed by Florida law, and because he committed tortious acts within, and against companies operating in, Florida. Defendant intentionally directed his wrongful conduct at Florida entities by soliciting, receiving, and misusing highly confidential and proprietary information generated and maintained in Florida, interfering with the governance and contractual relationships of Florida companies, and causing injury

that was suffered in Florida. These acts establish sufficient contacts with Florida to support the exercise of personal jurisdiction.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### A.     Cloverleaf's Governance Structure

13.     Cloverleaf Holdings, LLC is a Florida limited liability company that owns a majority interest in and serves as the designated Manager of B&T USA, LLC, a Florida limited liability company engaged in the manufacture, assembly, and wholesale distribution of firearms and firearm components. Under Cloverleaf's Operating Agreement (the "Agreement"), all governance and management authority is centralized exclusively in the Manager, and non-voting members possess no right to participate in governance, operations, employee supervision, banking, compliance, or decision-making on behalf of Cloverleaf or its managed subsidiaries. *See* Ex. 1, Agreement §§ 2.01, 3.01, 10.08.

14.     Pursuant to written resolutions and the Agreement, Sean Sullivan ("Sullivan") was appointed as Manager of Cloverleaf effective August 29, 2025, and has continuously served in that role since that date. *See* Ex. 2, Cloverleaf Resolution.

15.     Defendant Peter Penzell is expressly designated as a non-voting member in the Agreement, which specifically acknowledges and confirms that Penzell "shall have no voting rights in connection with the business and affairs of the Company." *Id*. § 10.08(a).

16.     The Agreement also imposes strict confidentiality obligations on all members. "Confidential Information" is defined to include "any proprietary or confidential information concerning: (i) the business operations or internal structure of the Company or its Affiliates; (ii) any customer or supplier list of the Company or its Affiliates; (iii) the financial condition of the Company or its Affiliates; and (iv) other confidential information pertaining to the Company or its Affiliates, including but not limited to trade secrets, processes, techniques, sales figures, and marketing techniques." The term "Affiliates" includes entities controlled by or under common control with Cloverleaf, including B&T USA. *Id*. § 11.01. Such information may not be disclosed or used except in the discharge of duties to the Company. *Id*.

17.     Section 10.02 of the Agreement also imposes a comprehensive non-solicitation and non-competition obligation on members, both during their membership and for a two-year restricted period thereafter. The provision prohibits any member, directly or indirectly and in any capacity, from soliciting or contacting ***Company Clients*** for competing or similar products or services; interfering with or

- 6 -

causing the termination of the Company's existing or prospective contracts; providing services, advice, or products to Company Clients outside the Company; using the Company's business concepts or strategies for non-Company purposes; or furnishing information, introductions, strategic guidance, pricing input, or other assistance designed to divert Company clients or business opportunities to third parties. Section 10.02 further bars members from receiving any personal benefit (present or future) from any such diversion or interference. *Id*. § 10.02.

18.    Section 10.07 of the Agreement further restricts members from using Cloverleaf's property, assets, Confidential Information, or business opportunities for activities outside the Company or for purposes adverse to the Company, and from engaging in competitive or conflicting activities without the Manager's consent. Section 10.07 expressly provides that Company property and assets include, without limitation, Confidential Information, Company opportunities, information developed for the Company, and other information or opportunities entrusted to a member by virtue of being a member. *Id*. § 10.07.

19.    Section 10.04 of the Operating Agreement further provides that a member's breach of the Agreement's confidentiality, non-interference, and governance provisions causes irreparable harm to the Company and expressly entitles Cloverleaf to recover its attorneys' fees and costs incurred as a result of such breach, in addition to injunctive and other equitable relief. *Id*. § 10.04.

**B.  Fiduciary Duties Owed by Members Under the Operating Agreement and Florida Law**

20.  In addition to contractual obligations described above, the Agreement and Florida law impose fiduciary duties on members, including duties of loyalty, good faith, and fair dealing, and obligations to refrain from divided loyalty, misuse of Company information, and conduct adverse to the Company's interests. *See* Fla. Stat. § 605.04091; *see also* Ex. 1, Agreement § 7.03.

21.  These fiduciary duties prohibit a member from using Company information for personal advantage, from aligning with third parties whose interests are adverse to the Company, from appropriating Company opportunities, and from engaging in knowing or intentional misconduct that undermines the Company's governance or operations.

**C.  The Exclusive License Agreement and Restrictions on Competition and Brand Control**

22.  B&T USA operates pursuant to an exclusive License Agreement with B&T AG ("B&T Swiss"), under which B&T USA holds exclusive rights in the United States to manufacture, assemble, distribute, and sell products bearing the "B&T" marks and to use associated intellectual property.[1] Further, in January 2025, B&T Swiss assigned all rights, ownership, and title to the "B&T" trademark to B&T

---

[1] B&T Swiss has purported to terminate the License Agreement as of February 19, 2026. Such termination is unlawful and in direct contradiction to the spirit and terms of the License Agreement, and the purported termination does not excuse or expunge any prior violations of the License Agreement.

USA, resulting in B&T USA's legal ownership of, as well as contractual rights in, the B&T trademark. *See* Ex. 3, USPTO Trademark Assignment.

23. B&T Swiss is controlled and/or managed by its Chief Executive Officer Karl Brügger ("Brügger"), a Swiss resident. Andreas Sollberger ("Sollberger"), also a Swiss resident, is the Chief Financial Officer of B&T Swiss.

24. The License Agreement expressly prohibits B&T Swiss from licensing intellectual property, selling products, or permitting manufacture or distribution of products bearing the B&T marks in the United States except through B&T USA or with B&T USA's written approval. The License Agreement further restricts competitive conduct that would undermine B&T USA's exclusive territorial rights.

25. The License Agreement further emphasizes preservation of brand integrity, quality control, and goodwill, and allocates responsibility for protecting the B&T marks and intellectual property within the United States to B&T USA.

26. Penzell was aware of the License Agreement and these license provisions, the exclusivity structure, and the economic dependence of B&T USA on continued exclusivity and control of U.S. manufacturing, distribution, and brand use.

**D.   Defendant's Unauthorized Access to Confidential Information**

27. Despite all express and implied restrictions, Penzell began seeking B&T USA's most sensitive internal information in January 2026.

28.     At Penzell's request, Joanie Pelaez ("Pelaez"), B&T USA's former Chief Financial Officer, transmitted internal spreadsheets reflecting accrued expenses, vendor liabilities, management fee reconciliations, and cash flow information. They were detailed and proprietary accounting records maintained for internal use and decision-making purposes.

29.     On January 25, 2026, Pelaez transmitted additional internal financial data to Penzell, including a detailed recap of payments made and payments received through December 31, 2025. This information disclosed cash flow timing, vendor relationships, and internal financial exposure and debt.

30.     On January 28, 2026, Pelaez transmitted further confidential financial materials to Penzell, including accrued management fee reconciliations that expressly were marked with confidentiality and ITAR warnings.

31.     Further, on January 28, 2026, Penzell sought and received confidential and proprietary information regarding B&T USA's import regulation compliance, including a detailed timeline of import information and communications.

32.     Penzell was not authorized to seek or receive any of this information, nor was it necessary for him to receive it to protect his economic interest in Cloverleaf.

**E.    Coordination with Foreign Counterparties and Plans to Seize Control**

33.    Upon information and belief, Penzell entered into an unlawful agreement with Brügger, Sollberger, B&T Swiss, Namada Enterprises, Inc. (a minority member of B&T USA that is wholly owned by B&T Swiss), other B&T Swiss affiliates, and other unknown co-conspirators (the "Co-Conspirators") to coordinate for the purpose of taking over B&T USA's management, governance, trademark rights, and profits on or about January 18, 2026, when he spoke to Brügger at a conference regarding B&T USA.

34.    After unlawfully obtaining B&T USA's highly confidential and proprietary information, Penzell analyzed and leveraged B&T USA's information in coordination with the Co-Conspirators whose interests were adverse to Plaintiffs. In a January 24, 2026 email to Brügger and Sollberger of B&T Swiss, Defendant proposed exploiting B&T USA's dependence on Swiss-supplied parts to force a change in ownership and management. Penzell wrote that without Switzerland there would be no flow of parts or products and therefore no company, and he outlined a plan under which Sullivan, B&T USA's Manager and the only Voting Interest Member and Manager of Cloverleaf, would be compelled to relinquish his ownership and management interests.

35.    As Penzell continued to receive highly confidential information, his conduct escalated from planning to interference with B&T USA's internal controls.

For example, on January 27, 2026, Pelaez expressed concern to Penzell about accessing email accounts belonging to Sullivan and stating that such conduct made her uneasy and approached ethical boundaries.

36.    Later, on January 28, 2026, Penzell sent an additional email to Brügger, Sollberger, and Pelaez accusing Sullivan of criminal conduct, advocating bankruptcy for B&T USA, proposing that all outstanding debt be called, and suggesting the formation of a new entity to replace B&T USA.

37.    On the evening of January 28, 2026, having become aware of the unlawful outflow of information to Penzell, Sullivan issued a written directive to Pelaez and others instructing them to cease all communications with Penzell and to stop sharing any information relating to B&T USA or Cloverleaf. Sullivan explained that Penzell had no legal or economic authority and that continued communications were in violation of explicit confidentiality obligations contained in B&T USA employment agreements.

38.    Despite this explicit directive, confidential information continued to flow to Penzell and the Co-Conspirators. On the morning of January 29, 2026, Pelaez forwarded Sullivan's notice letter to Brügger, Sollberger, and Penzell, along with commentary regarding internal communications and employee concerns.

39.    Shortly thereafter, Brügger responded, upon information and belief at Penzell's urging, by instructing Pelaez that she was authorized by B&T Swiss to

continue communicating with Penzell and that B&T Swiss would remain in direct contact with him to resolve the situation.

40. During this same period, Penzell circulated what he described as a change-of-control checklist and agenda. In a January 29, 2026 email sent to Brügger and others, Penzell outlined steps to remove executives from B&T USA, strip Sullivan of access to B&T USA's bank accounts, payroll systems, and email, cancel corporate credit cards, reassign regulatory responsibilities, and establish a board of directors for B&T USA. Penzell had no authority under the Agreement to take or propose any of these actions on behalf of Cloverleaf, much less for B&T USA.

41. As a direct result of Defendant's coordination with B&T Swiss and its executives, including his use and dissemination of B&T USA's confidential and proprietary information and his advocacy for restructuring or replacement of B&T USA's role in U.S. operations, B&T Swiss has now purported to terminate its License Agreement with B&T USA.

42. In purporting to terminate the License Agreement, B&T Swiss has ordered B&T USA to transfer the B&T trademark rights *to* B&T Swiss, to cease using the B&T trademark, and to ***change its name*** so as to avoid using the term "B&T." Upon information and belief, these demands were aided and/or orchestrated by Penzell.

- 13 -

43.    Further, following Penzell's dissemination of B&T USA's highly confidential and proprietary information, B&T Swiss acted to interfere with an ongoing client relationship between B&T USA and KF Armory in Georgia and to interfere with B&T USA's trademark rights. Upon information and belief, this interference was aided and/or orchestrated by Penzell.

44.    Specifically, on or about January 30, 2026, Brügger, on behalf of B&T Swiss, inserted himself in an email chain between B&T USA and leadership at KF Armory and informed the client that B&T Swiss would be able to support the client's purchase needs and that B&T Swiss would be shipping product to KF Armory directly under the B&T trademark.

45.    Upon information and belief, B&T Swiss did ship product—using the "B&T" trademark—to KF Armory in Georgia.

46.    Upon information and belief, Penzell further disclosed and transmitted confidential financial and corporate materials to Brügger without authorization. These materials were not public, were subject to confidentiality obligations, and were disclosed by Penzell outside any legitimate purpose related to his economic interest in Cloverleaf, and for the benefit of co-conspirators and third parties whose interests were adverse to Cloverleaf and B&T USA.

- 14 -

**F.     Oral Agreement Concerning 3D Printers and Defendant's Diversion of Critical Manufacturing Equipment**

47.     Some of B&T USA's primary revenue-generating products include firearm silencers and silencer components, the manufacture of which relies heavily on specialized additive manufacturing equipment, including industrial 3D printers used to produce critical internal components.

48.     On or about November 20, 2025, Cloverleaf, acting as Manager and on behalf of B&T USA, and Penzell entered into an oral agreement concerning the acquisition and use of four industrial 3D printers intended for use in B&T USA's manufacturing operations at its Utah facility. The parties agreed that 80% of profits generated from components produced on the 3D printers would be paid by B&T USA to an entity affiliated with Defendant to service the debt incurred to acquire the printers, and the remaining 20% of generated profits would be split equally between Defendant and Sullivan as ongoing royalties.

49.     The oral agreement was intended to benefit B&T USA directly by expanding its manufacturing capacity, reducing production bottlenecks, and increasing output of high-margin silencer components, while also benefiting Defendant through repayment of printer-related debt and royalty payments. By seeking to divert the printers and use the arrangement to advance interests adverse to B&T USA, Defendant interfered with Cloverleaf's operations and misused Cloverleaf opportunities in violation of Sections 10.02 and 10.07 of the Agreement.

50.     Two of the four printers were delivered to B&T USA's Utah facility in early January 2026 and are in the process of installation and calibration for use in B&T USA's manufacturing processes.

51.     The remaining two printers were purchased in December 2025 and have not yet been delivered to B&T USA's location.

52.     On or about February 26, 2026, Mr. Sullivan, on behalf of Cloverleaf and B&T USA, was alerted that the remaining two 3D printers had arrived in the United States and were progressing through customers, and Sullivan was asked to confirm the location and date for delivery. However, when Sullivan responded with the requested confirmation, he was informed that Penzell had given the printer vendor conflicting instructions.

53.     That is, despite the oral agreement, Penzell has instructed the printer vendor to redirect delivery of the remaining two printers away from B&T USA's Utah facility and to a different location not controlled by B&T USA.

54.     Penzell's diversion of the printers was undertaken unilaterally, without Plaintiffs' consent, and for purposes adverse to Plaintiffs' interests.

55.     The diversion of the remaining printers deprives B&T USA of critical manufacturing capacity, materially impairs its ability to produce silencer components, and directly undermines one of B&T USA's primary revenue streams.

56. Penzell's conduct has placed third-party vendors in an untenable position, created uncertainty regarding ownership and delivery instructions, and threatens to permanently remove revenue-generating equipment from B&T USA's control.

57. Penzell's diversion of the printers is part of a broader course of conduct designed to interfere with Plaintiffs' operations, leverage control over critical assets, and advance Defendant's personal interests at the expense of Cloverleaf and B&T USA.

*  *  *  *  *

58. The cumulative effect of Penzell's conduct has been severe and caused extensive financial damage and harm to B&T USA's goodwill and reputation. Employees have been placed in an untenable position, unsure whether to follow lawful management or respond to Penzell's demands. Sensitive and highly confidential financial and compliance information was disclosed to parties with adverse interests. Penzell further disrupted Plaintiffs' operations by working to divert critical manufacturing equipment—including industrial 3D printers essential to B&T USA's core silencer production—from Plaintiffs' control. Most fundamentally, the governance framework carefully established by the Agreement has been violated and severely undermined.

59. The Agreement was designed to centralize control in the Manager, protect confidential information, and prevent divided loyalty and unauthorized interference that would disrupt B&T USA's operations. Penzell's repeated and willful violations of the Agreement's provisions constitute wrongful conduct that has materially and adversely affected Plaintiffs' activities and affairs and has made it not reasonably practicable for Cloverleaf to continue operating with him remaining a member.

60. Penzell's conduct has damaged B&T USA's and Cloverleaf's business, and threatens to cause continuing harm, including loss of control over confidential and trade secret information, erosion of governance authority, exposure to regulatory and compliance risk, loss of trademark control and goodwill, and continuing interference with Plaintiffs' contractual and business relationships. Further, absent an order of judicial expulsion, Penzell will continue to exploit his position as a non-voting member of Cloverleaf to gain access to and misuse Plaintiffs' confidential information and interfere with Plaintiffs' operations.

## COUNT I
### (Breach of the Cloverleaf Operating Agreement)
### (Cloverleaf Holdings, LLC v. Peter Penzell)

61. Plaintiff Cloverleaf Holdings, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

62. The Agreement is a valid and binding contract governing Defendant Peter Penzell's rights and obligations as a non-voting member of Cloverleaf, including express limitations on member authority, strict confidentiality requirements, and prohibitions against adverse or competitive conduct.

63. Defendant committed the following breaches:

64. Breach of Section 3.01 (Exclusive Management Authority): Section 3.01 of the Agreement vests exclusive authority to manage the business, property, and affairs of Cloverleaf in the Manager and expressly provides that no member has authority to act on behalf of or bind Cloverleaf absent express authorization. Defendant breached Section 3.01 by holding himself out as having managerial authority, attempting to direct employees, influencing banking and information-technology controls, and inserting himself into governance matters despite lacking any authority to do so.

65. Breach of Section 10.01 (Confidential Information): Section 10.01 prohibits members from using or disclosing Confidential Information except in the discharge of duties to Cloverleaf and requires Members to safeguard such information. Defendant breached Section 10.01 by soliciting, obtaining, using, and disclosing Cloverleaf's and B&T USA's Confidential Information without authorization and for purposes adverse to Cloverleaf.

66.    Breach of Section 10.02 (Non-Solicitation/Non-Interference): Defendant further breached the Agreement by holding himself out as having managerial authority and attempting to direct employees, influence banking and information-technology controls, interfere with customer and vendor relationships, and otherwise participate in governance matters in direct violation of the Agreement's express restrictions.

67.    Breach of Section 10.07 (Use of Company Assets and Opportunities): Section 10.07 prohibits members from using Cloverleaf's property, assets, information, or opportunities for activities outside Cloverleaf or for purposes adverse to Cloverleaf without the Manager's consent. Defendant breached Section 10.07 by using Confidential Information and Cloverleaf opportunities to advance his own interests and the interests of third parties adverse to Cloverleaf.

68.    Breach of Section 10.08 (Additional Member Restrictions): Section 10.08 expressly provides that Defendant Peter Penzell has no voting rights and no authority to participate in the business or affairs of Cloverleaf. Defendant breached Section 10.08 by repeatedly acting as though he possessed governance or managerial authority and by interfering in matters reserved exclusively to the Manager.

69.    Defendant's breaches were willful, material, and ongoing. As a direct and proximate result, Cloverleaf has suffered substantial harm, including loss of

control over confidential information, disruption of governance, exposure to regulatory and competitive risk, and the incurrence of attorneys' fees and costs recoverable under the Agreement.

70.    Cloverleaf is entitled to damages, attorneys' fees, and all other remedies available under the Agreement and Florida law.

## COUNT II
### (Breach of Fiduciary Duty)
### (Cloverleaf Holdings, LLC v. Peter Penzell)

71.    Plaintiff Cloverleaf Holdings, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

72.    Under Florida law and the Cloverleaf Operating Agreement, members owe fiduciary duties of loyalty, care, good faith, and fair dealing to Cloverleaf. *See* Fla. Stat. § 605.04091; *see also* Ex. 1, Agreement § 7.03.

73.    The duty of loyalty prohibits a member from using Company property or information for personal benefit, from dealing with the Company on behalf of a person having an adverse interest, and from appropriating Company opportunities. The duty of care requires members to refrain from grossly negligent, reckless, or willful misconduct. The duty of good faith requires honesty of purpose and fidelity to the Company's interests.

74.    Defendant breached his fiduciary duties by aligning himself with parties whose interests were adverse to Cloverleaf and B&T USA, by using

Confidential Information for purposes unrelated and contrary to the Cloverleaf's interests, and by attempting to undermine lawful management and governance for his own financial benefit.

75.    Defendant further breached his fiduciary duties by engaging in divided loyalty, by advancing strategies designed to coerce changes in ownership and control, and by interfering with internal operations and external relationships despite lacking any authority to do so.

76.    Defendant's breaches were intentional, in bad faith, and constituted knowing misconduct. As a direct and proximate result, Cloverleaf suffered actual damages and faces ongoing risk of further harm.

## COUNT III
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Cloverleaf Holdings, LLC v. Peter Penzell)**

77.    Plaintiff Cloverleaf Holdings, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

78.    Defendant Peter Penzell was a party to the Cloverleaf Operating Agreement, which imposed express contractual rights and obligations governing his role as a non-voting member.

79.    Under Florida law, every contract contains an implied covenant of good faith and fair dealing requiring that contractual discretion be exercised honestly and

not in a manner that frustrates the contract's purpose or deprives the other party of the benefit of its bargain.

80.    The fundamental purpose of the Agreement was to support management and governance of B&T USA by centralizing governance authority in the Manager, protecting confidential information, and preventing divided loyalty and unauthorized interference in the day-to-day conduct of B&T USA's business.

81.    Defendant breached the implied covenant of good faith and fair dealing by exploiting his status as a member in Cloverleaf to obtain confidential information he was not entitled to receive, using that information for purposes adverse to Cloverleaf and B&T USA, aligning himself with third parties hostile to B&T USA, and attempting to undermine the governance structure expressly established by the Agreement.

82.    Defendant's conduct was undertaken in bad faith and for purposes inconsistent with the reasonable expectations of the parties at the time the Agreement was executed.

83.    As a direct and proximate result of Defendant's breach of the implied covenant, Cloverleaf has suffered harm and is entitled to damages and all other appropriate remedies.

## COUNT IV
### (Misappropriation of Trade Secrets)
### (Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001–688.009)
### (B&T USA, LLC v. Peter Penzell)

84. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

85. B&T USA owns and lawfully possesses trade secrets within the meaning of the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.002(4), including but not limited to B&T USA's proprietary customer and client lists, pricing and profit structure information, purchase prices and payment amounts, non-public financial data and internal accounting records, vendor and cash-flow information, management fee reconciliations, compliance and regulatory materials, firearm importation timelines, strategic business plans, and internal governance information (the "Trade Secrets"). B&T USA spent a significant amount of time, effort, and money developing this information, including proprietary customer lists and operational documentation.

86. B&T USA's Trade Secrets are not generally known or readily ascertainable.

87. B&T USA's Trade Secrets derive independent economic value from not being generally known or readily ascertainable through proper means by another person who could obtain economic value from their disclosure or use. For example,

B&T USA's pricing and profit structure information is highly valuable to competitors in deciding by how much they could undercut B&T USA's prices, and B&T USA's customer lists reflect a distillation of a larger universe of potential customers that embodies considerable effort, knowledge, time, and expense. As such, these customer lists and related commercial information qualify as trade secrets under Florida law.

88.    B&T USA took reasonable measures under the circumstances to maintain the secrecy of its Trade Secrets, including but not limited to contractual confidentiality obligations in the Cloverleaf Operating Agreement and B&T USA employment agreements, access restrictions, internal policies, limited dissemination to authorized personnel, confidentiality legends and warnings (including materials expressly marked to indicate that they may contain ITAR-controlled technical data subject to U.S. export-control restrictions), and express directives prohibiting unauthorized disclosure.

89.    Defendant Peter Penzell misappropriated B&T USA's Trade Secrets within the meaning of Fla. Stat. § 688.002(2) by acquiring them through improper means, including unauthorized solicitation and receipt of confidential information from B&T USA's employees in violation of contractual, fiduciary, and statutory duties.

- 25 -

90. Defendant further misappropriated B&T USA's Trade Secrets by using and disclosing them without Plaintiffs' consent and while knowing, or having reason to know, that the Trade Secrets were acquired by improper means and were subject to confidentiality obligations.

91. Defendant used and disclosed B&T USA's Trade Secrets for purposes adverse to B&T USA, including to coordinate with third parties whose interests were adverse to B&T USA, to interfere with Plaintiffs' governance and operations, and to develop strategies to coerce changes in ownership, management, or control of B&T USA.

92. Defendant knew or should have known that the information constituted trade secrets and that its acquisition, use, and disclosure were improper under FUTSA.

93. Defendant's misappropriation was willful and malicious, including because Defendant knowingly violated express contractual restrictions, ignored explicit directives to cease receiving and using confidential information, and continued to analyze, disseminate, and exploit Plaintiffs' Trade Secrets after being placed on notice that his conduct was unauthorized.

94. As a direct and proximate result of Defendant's misappropriation, B&T USA has suffered and continues to suffer actual damages, loss of control over proprietary information, and competitive and regulatory harm.

95.     Pursuant to Fla. Stat. § 688.004, B&T USA is entitled to recover damages for actual loss caused by the misappropriation and for unjust enrichment not taken into account in computing actual loss, or alternatively a reasonable royalty for Defendant's unauthorized disclosure or use of the Trade Secrets.

96.     Because Defendant's misappropriation was willful and malicious, B&T USA is entitled to exemplary damages in an amount up to twice any damages awarded, pursuant to Fla. Stat. § 688.004(2).

97.     B&T USA is further entitled to an award of reasonable attorneys' fees and costs pursuant to Fla. Stat. § 688.005.

## COUNT V
### Misappropriation of Trade Secrets
### (Defend Trade Secrets Act, 18 U.S.C. § 1836)
### (Cloverleaf Holdings, LLC and B&T USA, LLC v. Peter Penzell)

98.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

99.     B&T USA owns and lawfully possesses trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), including but not limited to B&T USA's proprietary customer and client lists, pricing and profit structure information, purchase prices and payment amounts, non-public financial data and internal accounting records, vendor and cash-flow information, management fee reconciliations, compliance and regulatory materials, firearm

importation timelines, strategic business plans, and internal governance information. B&T USA spent a significant amount of time, effort, and money developing this information, including proprietary customer lists and operational documentation.

100. B&T USA's Trade Secrets are not generally known or readily ascertainable.

101. B&T USA's Trade Secrets derive independent economic value from not being generally known or readily ascertainable through proper means by another person who could obtain economic value from their disclosure or use. For example, B&T USA's pricing and profit structure information is highly valuable to competitors in deciding by how much they could undercut B&T USA's prices, and B&T USA's customer lists reflect a distillation of a larger universe of potential customers that embodies considerable effort, knowledge, time, and expense. As such, these customer lists and related commercial information qualify as trade secrets under 18 U.S.C. § 1839(3).

102. B&T USA took reasonable measures to maintain the secrecy of its Trade Secrets, including contractual confidentiality provisions in the Cloverleaf Operating Agreement, B&T USA's employment agreements, access restrictions, internal policies, limited dissemination to authorized personnel, confidentiality legends and warnings (including materials expressly marked to indicate that they

may contain ITAR-controlled technical data subject to U.S. export-control restrictions), and directives prohibiting unauthorized disclosure.

103. The Trade Secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, including the manufacture, assembly, importation, and sale of firearms and firearm components within the United States and internationally.

104. Defendant Peter Penzell misappropriated B&T USA's Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring them through improper means, including unauthorized solicitation and receipt of confidential internal information from B&T USA's employees in violation of contractual, fiduciary, and statutory duties.

105. Defendant further misappropriated B&T USA's Trade Secrets by using and disclosing them without Plaintiffs' consent and knowing, or having reason to know, that the Trade Secrets were acquired by improper means and were subject to confidentiality obligations.

106. Defendant used and disclosed B&T USA's Trade Secrets for purposes adverse to B&T USA, including to coordinate with foreign entities and individuals whose interests were adverse to B&T USA, to interfere with Plaintiffs' governance and operations, to develop strategies to coerce changes in ownership or control, and to advance competing or replacement business strategies.

107.  Defendant's misappropriation was willful and malicious, including because Defendant knowingly violated express contractual restrictions, ignored explicit directives to cease receiving and using confidential information, and continued to analyze, disseminate, and exploit Trade Secrets after being placed on notice that his conduct was unauthorized.

108.  As a direct and proximate result of Defendant's misappropriation of Trade Secrets, Plaintiffs have suffered and will continue to suffer actual damages, loss of control over proprietary information, competitive and regulatory harm.

109.  Pursuant to 18 U.S.C. § 1836(b)(3)(B), B&T USA is entitled to recover damages for actual loss and unjust enrichment caused by Defendant's misappropriation, or alternatively a reasonable royalty for Defendant's unauthorized disclosure or use of Trade Secrets.

110.  Because Defendant's misappropriation was willful and malicious, B&T USA is entitled to exemplary damages in an amount up to two times the damages awarded pursuant to 18 U.S.C. § 1836(b)(3)(C).

111.  B&T USA is further entitled to an award of reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT VI
### (Tortious Interference with Business Relationships)
### (B&T USA, LLC v. Peter Penzell)

112. Plaintiff B&T USA, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein. B&T USA and B&T Swiss were parties to a valid and enforceable License Agreement granting B&T USA exclusive rights in the United States to manufacture, assemble, distribute, and sell products bearing the "B&T" trademark and to control brand integrity, quality, and regulatory compliance.

113. Defendant Peter Penzell had actual knowledge of the License Agreement, its exclusivity provisions, and its importance to B&T USA's continued operations.

114. Defendant intentionally and unjustifiably interfered with the License Agreement by coordinating with B&T Swiss and its executives, using B&T USA's confidential and trade secret information to undermine B&T USA's contractual position, and advocating actions designed to pressure, destabilize, or terminate the License Agreement.

115. B&T Swiss has now purported to terminate the License Agreement, resulting in an actual breach or repudiation of the contract.

116. Defendant's conduct was a direct and proximate cause of B&T Swiss's purported termination and the resulting harm to B&T USA, including loss of

exclusive IP rights, disruption of operations, regulatory exposure, and economic loss.

117. Defendant was not a party to the License Agreement and had no privilege or justification to interfere with its performance.

118. As a result of Defendant's tortious interference with contract, B&T USA has suffered damages and is entitled to compensatory damages, injunctive relief, and all other available remedies.

## COUNT VII
### Civil Conspiracy
### (Cloverleaf Holdings, LLC and B&T USA, LLC v. Peter Penzell)

119. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

120. Defendant Peter Penzell knowingly entered into an agreement on or about January 18, 2026, with Brügger, Sollberger, B&T Swiss, Namada Enterprises, Inc. (a minority member of B&T USA that is wholly owned by B&T Swiss), other B&T Swiss affiliates, and other unknown Co-Conspirators to engage in unlawful conduct, including breach of fiduciary duty, misappropriation of trade secrets, tortious interference with contractual relationships, and infringement of Plaintiffs' trademark rights.

121. The object of the conspiracy was to undermine Plaintiffs' lawful management and governance, misuse Plaintiffs' confidential and proprietary

information, interfere with Plaintiffs' contractual and employment relationships, and position Defendant and the Co-Conspirators to seize or redirect control of Plaintiffs' business operations and assets.

122. In furtherance of the conspiracy, Defendant and the Co-Conspirators committed overt acts, including soliciting and transmitting confidential information, inducing breaches of fiduciary duty, coordinating unauthorized disclosures to foreign parties, and interfering with Plaintiffs' contractual, employment, and trademark rights.

123. Defendant knowingly committed these acts in concert with the Co-Conspirators and with actual knowledge of the unlawful objectives of the conspiracy.

124. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages, including loss of control over confidential information, disruption of governance and operations, impairment of contractual and employment relationships, loss of trademark control and goodwill, and economic harm.

125. Defendant is jointly and severally liable for all acts committed in furtherance of the conspiracy and for all resulting damages.

## COUNT VIII
## (Unjust Enrichment)
## (Cloverleaf Holdings, LLC and B&T USA, LLC v. Peter Penzell)

126. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

127. Defendant knowingly obtained and retained valuable benefits from Plaintiffs, including access to confidential financial, operational, compliance, and strategic information belonging to Cloverleaf and B&T USA.

128. Defendant appreciated and accepted these benefits, which were not conferred gratuitously and were not provided pursuant to any authorized role or contractual entitlement.

129. Defendant used and leveraged these benefits for his own personal and economic advantage and for the benefit of third parties with interests adverse to Plaintiffs.

130. It would be inequitable for Defendant to retain the benefits derived from Plaintiffs' confidential and proprietary information without compensating Plaintiffs.

131. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to restitution and disgorgement of all benefits unjustly obtained by Defendant.

## COUNT IX
### (Tortious Interference with Employment Agreement)
### (B&T USA, LLC v. Peter Penzell)

132.   Plaintiff B&T USA, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

133.   At all relevant times, Pelaez was employed by B&T USA as its Chief Financial Officer pursuant to a valid and enforceable employment agreement governing, among other things, her duties of loyalty, confidentiality, reporting authority, and continued employment.

134.   Defendant Peter Penzell had actual knowledge of Pelaez's employment agreement and of her contractual and fiduciary obligations to B&T USA, including her obligation to report exclusively to lawful management and to safeguard confidential and proprietary Company information.

135.   Defendant intentionally and unjustifiably interfered with Pelaez's employment relationship by soliciting confidential financial and compliance information from her, attempting to direct her conduct despite lacking any managerial authority, encouraging actions inconsistent with her contractual duties, and placing her in direct conflict with lawful management.

136.   Defendant further interfered with Pelaez's employment relationship by continuing to engage her and solicit information after Cloverleaf's Manager

expressly directed that all communications with Defendant cease, thereby exacerbating the disruption to the employment relationship.

137. Defendant was not a party to Pelaez's employment agreement, had no supervisory or managerial authority over her, and possessed no privilege or legal justification to interfere with her employment relationship.

138. Defendant's interference was intentional, improper, and undertaken with knowledge that it was substantially certain to disrupt Pelaez's employment relationship with B&T USA.

139. As a direct and proximate result of Defendant's tortious interference, B&T USA suffered damages, including disruption of its finance and compliance functions, impairment of employee loyalty and reporting structures, exposure to regulatory and operational risk, and loss of workforce stability.

140. Defendant's conduct was willful and malicious, entitling B&T USA to recover compensatory damages to the extent permitted by law, injunctive relief, and all other relief available at law or in equity.

**COUNT X**
**(Aiding and Abetting Breach of Fiduciary Duty)**
**(B&T USA, LLC v. Peter Penzell)**

141. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

142.  As alleged above, Joanie Pelaez owed fiduciary duties of loyalty, confidentiality, good faith, and obedience to B&T USA, and breached those duties by disclosing confidential and proprietary information without authorization and acting outside lawful management authority.

143.  Defendant Peter Penzell had actual knowledge of Pelaez's fiduciary duties and of her breaches, including because he knew he lacked authority, was expressly instructed that communications and disclosures must cease, and nonetheless continued to solicit and receive confidential information.

144.  Despite this knowledge, Defendant knowingly and substantially assisted Pelaez's breaches of fiduciary duty by soliciting unauthorized disclosures, encouraging conduct inconsistent with lawful management directives, continuing communications after being instructed to stop, and facilitating the transmission of internal B&T USA information to third parties with interests adverse to Plaintiffs.

145.  Defendant's knowing assistance was a substantial factor in causing and perpetuating Pelaez's breaches and in enabling the resulting harm to Plaintiffs.

146.  Defendant acted intentionally and in bad faith, for the purpose of undermining Plaintiffs' governance, disrupting operations, and advancing his own economic interests and those of third parties adverse to Plaintiffs.

147.  As a direct and proximate result of Defendant's aiding and abetting, Plaintiffs suffered damages, including loss of control over confidential information,

disruption of financial and compliance functions, increased regulatory and operational risk, and economic harm.

148. Defendant's conduct was willful and malicious, entitling Plaintiffs to compensatory damages to the extent permitted by law, injunctive relief, and all other available remedies.

**COUNT XI**

**Contributory Trademark Infringement**
**(15 U.S.C. §§ 1114 and 1125)**
**(B&T USA, LLC v. Peter Penzell)**

149. Plaintiff B&T USA, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

150. B&T USA is the owner of the "B&T" trademark (the "B&T Mark") used in connection with firearms, firearm components, and related goods and services in the United States. *See* Ex. 3. The License Agreement governing U.S. manufacture and distribution of B&T-branded products was executed prior to the assignment of the B&T Mark to B&T USA and was intended to preserve exclusive U.S. control over manufacturing, distribution, quality assurance, regulatory compliance, and brand integrity.

151. As the owner of the B&T Mark, B&T USA possesses the exclusive right to control the use, source, quality, and goodwill associated with the Mark in the United States and to prevent unauthorized or confusing uses that would impair consumer perception, regulatory compliance, or brand integrity.

152. Third parties, including without limitation Defendant Peter Penzell and B&T Swiss, have engaged in and facilitated the unauthorized use of the "B&T" trademark in the United States, including by promoting, offering, and arranging for the sale and distribution of B&T-branded products in a manner not authorized by B&T USA and outside the scope of any valid license. This conduct includes the actual and threatened use of the B&T Mark in communications with U.S. customers and counterparties, and the assertion or exercise of control over the use of the Mark, in a manner likely to cause confusion as to source, sponsorship, affiliation, or control of B&T-branded goods and services.

153. Defendant Peter Penzell had actual knowledge of B&T USA's ownership of the B&T Mark, the territorial and contractual limitations governing use of the Mark in the United States, and the substantial risk of consumer confusion arising from unauthorized, uncontrolled, or redirected use of the Mark.

154. Despite this knowledge, Defendant intentionally induced, facilitated, encouraged, or materially contributed to infringing conduct by coordinating with third parties whose interests were adverse to B&T USA, advocating for restructuring or replacement arrangements that would divert control or use of the B&T Marks away from B&T USA, and using B&T USA's confidential and proprietary information to assist third parties in positioning themselves to exploit the B&T Mark in the United States without B&T USA's authorization.

155. Defendant further materially contributed to infringement by attempting to undermine B&T USA's ability to exercise trademark control, including quality control, source control, and regulatory oversight over goods sold under the B&T Mark, thereby threatening loss of trademark control and substantially increasing the likelihood of consumer confusion.

156. Defendant's conduct was intentional, knowing, and undertaken with reckless disregard for B&T USA's trademark rights and with knowledge that his actions would enable, facilitate, or encourage trademark infringement by third parties.

157. As a direct and proximate result of Defendant's contributory trademark infringement, B&T USA has suffered and will continue to suffer irreparable harm, including loss of control over the B&T Mark in the United States, damage to goodwill and reputation, increased risk of consumer confusion, regulatory exposure, and economic injury.

158. Defendant's conduct constitutes contributory trademark infringement and false designation of origin in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125.

159. B&T USA is entitled to injunctive relief prohibiting Defendant from further inducing, facilitating, or assisting any infringement of the B&T Mark in the

United States, as well as damages, disgorgement of profits, attorneys' fees, costs, and all other relief available under 15 U.S.C. § 1117.

160. B&T USA is entitled to injunctive relief prohibiting Defendant from further inducing, facilitating, or assisting any infringement of the "B&T" trademark, as well as damages, disgorgement, attorneys' fees, and all other relief available under 15 U.S.C. § 1117.

## COUNT XII
### (Breach of Oral Contract – Diversion of 3D Printers)
### (Cloverleaf Holdings, LLC and B&T USA, LLC v. Peter Penzell)

161. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

162. Plaintiffs, acting through Cloverleaf on behalf of and for the benefit of B&T USA, and Defendant Peter Penzell entered into a valid and enforceable oral contract on or about November 20, 2025, concerning the acquisition, delivery, and use of four industrial 3D printers intended for B&T USA's manufacturing operations.

163. The material terms of the oral contract included Defendant's agreement that all four 3D printers would be delivered to and used by B&T USA, that B&T USA would generate production revenue from use of the printers, and that profits would be allocated pursuant to the parties' agreed structure.

164. The oral agreement was supported by mutual consideration, including Plaintiffs' agreement to integrate the printers into B&T USA's operations, generate production revenue, and allocate profits in a manner that benefitted Defendant.

165. Plaintiffs performed their obligations under the oral contract, including by accepting delivery of the initial two printers, installing and operating them at B&T USA's Utah facility, and preparing to integrate the remaining printers into production.

166. Defendant materially breached the oral contract by instructing the printer vendor to divert delivery of the remaining two printers away from B&T USA and by withholding those printers from Plaintiffs' operations.

167. Defendant's breach was willful and deprives Plaintiffs of the benefit of their bargain, including expanded manufacturing capacity and increased silencer production.

168. As a direct and proximate result of Defendant's breach, Plaintiffs will suffer damages, including lost production capacity, lost profits, operational disruption, and economic loss.

169. Plaintiffs are entitled to compensatory damages, injunctive relief prohibiting further diversion or withholding of the printers, and all other relief available at law or in equity.

**COUNT XIII**

**(Judicial Expulsion of Peter Penzell as Member of Cloverleaf)**
**(Cloverleaf Holdings, LLC v. Peter Penzell)**

170. Plaintiff Cloverleaf Holdings, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

171. Defendant Peter Penzell is a non-voting member of Cloverleaf, holding solely economic interests and subject to the rights, duties, restrictions, and obligations set forth in the Cloverleaf Operating Agreement and Florida's Revised Limited Liability Company Act.

172. Florida Statute § 605.0602(5) authorizes a court to expel a member of a limited liability company upon a determination that the member has engaged in wrongful conduct that has adversely and materially affected the company's activities and affairs, or has willfully or persistently committed a material breach of the operating agreement or a duty owed to the company, or has engaged in conduct making it not reasonably practicable to carry on the company's activities with the member remaining as a member.

173. Defendant has engaged in wrongful conduct that has adversely and materially affected Cloverleaf's activities and affairs, including but not limited to:

   a.    obtaining, retaining, using, and disclosing Cloverleaf's and B&T USA's confidential and proprietary information without authorization;

b.    violating express confidentiality, non-interference, and non-governance provisions of the Cloverleaf Operating Agreement;

c.    coordinating with, and pursuing wrongful conduct with, third parties whose interests were adverse to Cloverleaf and B&T USA;

d.    interfering with internal governance, employee reporting lines, and operational controls at Cloverleaf and B&T USA despite having no authority to do so; and

e.    attempting to coerce changes in ownership, management, and control of the business outside the mechanisms permitted by the Operating Agreement.

174. Defendant has willfully and persistently committed material breaches of the Cloverleaf Operating Agreement, including breaches of provisions governing confidentiality, use of company information, restrictions on member authority, and prohibitions against adverse and competitive conduct.

175. Defendant has further breached duties owed to Cloverleaf under Florida law, including duties of loyalty, good faith, and fair dealing, by engaging in divided loyalty, using company information for purposes adverse to the company, and attempting to advance his personal economic interests at the expense of Cloverleaf.

176. Defendant's conduct has undermined the governance framework established by the Cloverleaf Operating Agreement, placed employees in untenable

and conflicted positions, exposed Cloverleaf to regulatory, competitive, and legal risk, and destroyed the trust and cooperation necessary for B&T USA to operate as intended.

177. As a result of Defendant's conduct, it is not reasonably practicable to carry on Cloverleaf's activities and affairs with Defendant remaining as a member, even in a non-voting capacity.

178. Defendant's continued membership threatens ongoing and irreparable harm to Cloverleaf, including continued misuse of confidential information, further interference with operations, and continued destabilization of the company's governance and business relationships.

179. Pursuant to Fla. Stat. § 605.0602(5), Cloverleaf is entitled to an order judicially expelling Defendant Peter Penzell as a member of Cloverleaf.

180. Cloverleaf is further entitled to all ancillary relief necessary to effectuate Defendant's expulsion, including determination of the consequences of expulsion under the Agreement and Florida law.

## COUNT XIV
### (Declaratory Judgment)
### (Cloverleaf Holdings, LLC v. Peter Penzell)

181. Plaintiff Cloverleaf Holdings, LLC realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

182. An actual and justiciable controversy exists between Cloverleaf and Defendant concerning Defendant's rights, status, and authority as a member of Cloverleaf.

183. Defendant has asserted, expressly or by conduct, that he possesses authority to access confidential information, manage B&T USA, participate in governance of Cloverleaf and B&T USA, and influence operational decisions, all of which Cloverleaf disputes.

184. Under the Cloverleaf Operating Agreement and Florida law, Defendant is a non-voting member of Cloverleaf with a minority economic interest and no governance, management, or operational authority and no right to access confidential information except as expressly authorized by the Manager.

185. Further, as described in detail above, Defendant has breached his obligations, both explicit and implied, to Cloverleaf.

186. Cloverleaf, therefore, seeks a declaration pursuant to Florida law that:

    a. Defendant has no voting, governance, or management rights in Cloverleaf;

    b. Defendant has no authority to exercise managerial authority over B&T USA, including direct employees or access confidential information; and

    c.     Defendant's role in Cloverleaf is limited to a minority, passive economic interest only.

    d.     Defendant has breached his explicit and implied obligations to Cloverleaf under the Cloverleaf Operating Agreement.

187. Declaratory relief is necessary and appropriate to clarify the parties' rights and obligations and to prevent ongoing and future harm.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs Cloverleaf Holdings, LLC and B&T USA, LLC respectfully request that this Court enter judgment in their favor and against Defendant Peter Penzell and grant the following relief:

a. Declaratory relief declaring that Defendant has no

    1. voting, governance, or management rights in Cloverleaf;

    2. authority to exercise managerial authority over B&T USA, including direct employees or access confidential information; and

    3. role in Cloverleaf beyond that of a minority, passive economic interest only;

b. Declaratory relief declaring that Defendant breached his explicit and implicit obligations under the Cloverleaf Operating Agreement;

c. Judicial expulsion of Defendant as a member of Cloverleaf Holdings, LLC pursuant to Fla. Stat. § 605.0602;

d.  Compensatory damages in an amount to be determined at trial;

e.  Treble and punitive damages for willful conduct, as permitted by law;

f.   Disgorgement and restitution of all benefits unjustly obtained by Defendant;

g.  An award of attorneys' fees and costs, as permitted by the Agreement and applicable law;

h.  Pre-judgment and post-judgment interest as allowed by law; and

i.   Such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: March 16, 2026

Krystal Swendboe (*pro hac vice* forthcoming)
kswendsboe@wiley.law

/s/ *Amanda R. Jesteadt*

Amanda R. Jesteadt (FL Bar No. 73149)
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
ajesteadt@wiley.law

*Attorneys for Plaintiffs*